## Case No. 2,995.

COLGATE v. WESTERN UNION TEL. CO.

[15 Blatchf. 365;[1] 4 Ban. & A. 36; 14 O. G. 943; Merw. Pat. Inv. 359.]

Circuit Court, S. D. New York. Nov. 26, 1878.

PATENTS—"SUBMARINE INSULATION" — CONSTRUCTION—EXPLANATION OF INVENTION — ABANDONMENT—WITHDRAWAL OF APPLICATION — VALIDITY.

1. The letters patent [No. 65,019] granted to George B. Simpson, May 21st, 1867, for an "improvement in insulating submarine cables," are valid.

[Cited in Cary v. Wolff, 24 Fed. 141.]

2. The invention defined.

3. The claim of said patent, namely, "the combination of gutta percha and metallic wire, in such form as to encase a wire or wires, or other conductors of electricity, within the nonconducting substance, gutta percha, making a 'submarine telegraph cable,' at once flexible and convenient, which may be suspended on poles in the air, submerged in water, or buried in the earth, to any extent, for atmospheric and submarine telegraphic communication, and for other electric, galvanic and magnetic uses, as hereinbefore described," construed.

[Distinguished in Ansonia Brass & Copper Co. v. Electrical Supply Co., 32 Fed. 86; Busell Trimmer Co. v. Stevens, 137 U. S. 434, 11 Sup. Ct. 154.]

4. The history of Simpson's efforts to obtain a patent for his invention, from January, 1848, until May, 1867, given.

5. His various applications were one continuous application, and he did not abandon his invention.

6. His receiving back from the patent office, after his application was rejected, $20 paid by him as a fee, held not to operate as a withdrawal of his application.

[In equity. Bill by Clinton G. Colgate against the Western Union Telegraph Company to enjoin infringement of letters patent No. 65,019].

William D. Shipman and Frederic H. Betts, for plaintiff.

George Gifford, George W. Soren, and William C. Witter, for defendants.

BLATCHFORD, Circuit Judge. This suit is founded on letters patent granted to George B. Simpson, as inventor, May 21st, 1867, for an "improvement in insulating submarine cables." The specification states, that Simpson has invented "a new and useful improvement in electrical conductors for telegraphic purposes." It says: "To enable others to

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

make and use my 'submarine telegraph cable,' I will describe its manufacture thus: I dissolve gutta percha with chloroform, or any other known solvent; I soften gutta percha in boiling water, steam or dry heat; I combine gutta percha with metallic wire, by means of a brush, or by immersing the wire in the solution, when in the solvent state; I combine gutta percha and metallic wire with the fingers, or any machine which may facilitate the operation and execute the work more perfectly, by pressing the gum upon and around the wire, or by spinning it only, when in a plastic state, into thin and ribbon-like strips, and twining it on then tightly and continuously around the wire, thus combining the gutta percha and metallic wire, and insulating the wire to any extent. By this mode of combination, I cover the wire on all sides with a uniform coating of gutta percha of any desired thickness, for the purpose of securing a conductor of electricity within the non-conducting substance, gutta percha, which combination forms a 'submarine telegraph cable,' flexible and convenient, which may be suspended on poles in the air, submerged in water, or buried in the earth. This mode of combination and insulation confines the electric current to the wire, wires or other conductors of electricity, shielding it and them from contact with any and all external electric, galvanic or magnetic influences whatsoever, thus attaining a great triumph in art, namely, the absolute control of electric and galvanic currents, for atmospheric and submarine telegraphic communication, and for other electric, galvanic and magnetic uses. (See drawings.)" The claim is in these words: "The combination of gutta percha and metallic wire, in such form as to encase a wire or wires, or other conductors of electricity, within the non-conducting substance, gutta percha, making a 'submarine telegraph cable,' at once flexible and convenient, which may be suspended on poles in the air, submerged in water, or buried in the earth, to any extent, for atmospheric and submarine telegraph communication, and for other electric, galvanic and magnetic uses, as hereinbefore described."

It is plain, from the language of this specification, that the point of the invention is, to make use of the fact that gutta percha is a non-conductor of electricity, to insulate, by means of gutta percha, a metallic wire which is a conductor of electricity, and thus prevent the escape of electricity from the metallic wire, when it is suspended in the air, or submerged in water, or buried in the earth, when, but for such insulation, the electricity would escape from the metallic wire. The mode of insulation described is to combine the gutta percha and the metallic wire in such manner that the wire will be covered on all sides with a uniform coating of gutta percha. Adequate means of softening the gum and putting it into such condition as to permit it to be so combined with the wire are set forth; and it is declared that such mode of combination and insulation confines the electric current to the wire and shields the wire from contact with all external electric influences. It is manifest, that the gist of the invention is the discovery of the fact that gutta percha is a non-conductor of electricity, and the application of that fact to practical use by combining gutta percha, by the means specified, with a metallic wire, in the manner described, and then using the cable formed by such combination, for the purpose of conducting electricity along the enclosed wire. The point of the invention is not the mere mechanical covering of a metallic wire with gutta percha, as a mechanical protection from abrasion or injury from without, or for any purpose aside from a use of the covered wire as a conductor of electricity. The claim is substantially a claim to the use, as a conductor of electricity, of a metallic wire insulated by gutta percha by the means and in the manner described in the specification. The claim is valid, even though a metallic wire covered with gutta percha existed before the plaintiff's invention, if it was not known that gutta percha was a non-conductor of electricity and could be used to insulate the wire. The use by the patentee of the wire so covered to conduct electricity was not a double use of the covered wire, even though the covered wire existed before, nor was it a use of it for a purpose at all analogous to any use before made of it, if such prior use of it was not to conduct electricity along the wire, and if it was not before known that gutta percha was a non-conductor of electricity and could be used to insulate a metallic wire used as a conductor of electricity.

The answer admits the use by the defendant of submarine cables in the insulation of which gutta percha was employed, but does not admit that it thereby used the invention patented to Simpson. It also sets up, that the alleged invention was before known and used, that it had been, for more than two years before Simpson's application for a patent therefor, in public use in the United States with the knowledge, consent and allowance of Simpson; that, if Simpson was the first inventor of the alleged invention, he wilfully and without excuse and for many years delayed and forbore to apply for a patent for it, and abandoned it and his right to have a patent for it, and dedicated it to the public, and, meantime, it became known to the public and the defendant from other sources; that the thing claimed by the patent is not patentable subject-matter, and, therefore, the patent is null and void; and that the patent is void for the reason that the alleged invention consists in applying to telegraph wires, or in using for telegraphic purposes, what before had been applied to other articles or uses for other purposes,

and, therefore, the invention is not patentable subject-matter. The fact of infringement, by the use by the defendant of what is claimed in the claim of the patent as the invention of Simpson, is satisfactorily proved and was not contested on the hearing.

It is contended, for the defendant, that the patent is broadly for the combination of gutta percha with a metallic wire, so that the wire is covered and encased by the gutta percha, and is not for the use of the combination or for a method of using it, and is not for a discovery or for an invention founded on or involving a discovery; that, whenever wire is found covered by gutta percha in such manner that the gutta percha is capable of confining electricity to the wire, an article is found which is included in the patent; that whoever so covers wire is as much an infringer of the patent as he is who uses it for telegraphic purposes; and that, if the wire be so covered, whoever uses it for a band for a cotton bale or for a belting for machinery, infringes the patent. The construction hereinbefore given to the specification and claim shows that these views on the part of the defendant are not sound.

It is further contended, for the defendant, that, as it was known that resins and gums, as a genus of articles, were electric insulators, it did not require or involve any invention, when gutta percha became known, to cover wire with it, to insulate the wire. It is very easy for wisdom after an event to say that it was a natural conclusion that gutta percha would be an insulator, from the known insulating properties of gums and resins generally. But, the evidence in this case shows, that, although gutta percha was known, and the means of softening and manipulating it were known, many experienced men, engaged in the business of telegraphy, groped about, experimenting first with one device and then with another, in fruitless effort to secure a practical means of crossing water courses with lines of telegraph wires, until it was at length found out that gutta percha was the needed insulator. It is also shown that Faraday, the distinguished scientist, announced to the world as a new thing the fact that he had discovered that gutta percha was a good electrical insulator. The position taken is, therefore, untenable.

Equally unsound is the view urged on the part of the defendant, that the use of gutta percha instead of India rubber, to insulate a wire, was a mere change of material, and an obvious substitution, and, therefore, not patentable. The cases of the door knob, and the button, and the wagon reach, have no application to a case like the present. Those who were seeking a practically perfect insulator had India rubber and found it not to be what was needed. The present case is not merely one of producing a better or cheaper or more durable article to attain the same result, nor is it one falling within the principle, that a change involving only mechanical skill is not patentable.

Nothing that has been put in evidence by the defendant carries back the publication of the discovery of the insulating properties of gutta percha to a date earlier than the 1st of March, 1848. That is the date of the publication in England of the discovery of such properties by Faraday. It is entirely clear, that Simpson had, prior to that time, made a like discovery. On the 24th of January, 1848, he made oath to a specification for a patent for "a new and improved mode of conducting electricity through water and beneath the earth," and such specification, with the oath and a drawing and a petition for a patent, but without any fee or model, were filed in the patent office on the 31st of January, 1848. In that specification Simpson says: "The nature of my invention consists in insulating the metallic wire, covering it with a glass bead chain, socketed and closely jointed together; also, covering the glass chain with an insoluble India rubber (or gutta percha) tube, jointed, cemented, and banded together, thus forming a submarine conductor of electricity, as hereinafter described. To enable others to make and use my invention, I will proceed to describe the combination, its construction and operation. The metallic wire (A in the drawing) is first insulated with insoluble India rubber or gutta percha; the insulated wire is then covered with glass beads (B), socketed together, so as to form a close joint, every *joint (C) bead* having a groove around the middle sufficient to admit of a band or fastening to prevent displacement on the wire; *an insoluble India rubber tube (D)* is then drawn over the glass bead chain, jointed, cemented and banded together (E), so as to be both *water and air tight*. The object of this arrangement or combination is, to guard against and prevent the water from coming in direct contact with the telegraphic wire, thus securing the entire control of this mysterious agent. This combination secures the object so much desired. By insulating the wire with the gums, prevents the water from coming in direct contact with it; by covering the insulated wire with *glass beads* closely jointed, confines the electricity to the wire; and if, by the operation of *natura laws*, chemical action produces moisture inside the *India rubber tube*, the space between the joints of the glass chain being comparatively nominal, the amount of water thus produced and occupying said space would amount to little more than moisture, and, even if this moisture were to come in direct contact with other conductors of electricity, it would require a vast amount of surface thus exposed, to destroy the entire current; but *the insoluble India rubber tube* which encases the whole chain, being *in and of itself a powerful non-conductor*, throws up an interminable barrier between the great vol-

ume of water outside and the comparative moisture inside the tube, thus effectually confining and controlling the great current of electricity passing over the telegraphic wire. The joints in the glass chain, and the elasticity of *the India rubber tube,* when complete, (D), *renders it* sufficiently flexible to give any desired curve. *Now,* what I claim by my invention and desire to secure by letters patent, is the combination and arrangement of *the gums and glass* around the telegraphic wire, in such form as to secure the controlling power of the mysterious agent 'electricity,' as hereinbefore described."

On the 21st of February, 1848, Simpson signed another specification, which he sent to the patent office in a letter bearing that date, which letter says: "Owing to the haste in which I prepared my first specifications, they were not as explicit as they ought to have been. I have, therefore, prepared another set, supplying the former deficiency and embracing the whole principles of my plan for which I have asked letters patent." This specification, like the first one, declares the invention to be "a new and improved mode of conducting electricity through water and beneath the earth." The expressions in the first specification which are varied in the second are put in italics in the above copy; and the language found in the second specification which is not found in the first is put in italics in the following copy of the second. The second specification says: "The nature of my invention consists in insulating the metallic wire, covering it with a glass bead chain socketed and closely jointed together, also covering the glass chain with an insoluble India rubber or gutta percha tube, jointed, cemented and banded together, thus forming a submarine conductor of electricity, as hereinafter described. To enable others to make and use my invention, I will proceed to describe the combination, its construction and operation. The metallic wire (*a* in the drawing) is first insulated with insoluble India rubber or gutta percha, the insulated wire is then covered with glass beads (*b*) socketed together so as to form a close joint, every *joint bead* (*c*) having a groove around the middle sufficient to admit of a band or fastening to prevent displacement on the wire; *an insoluble India rubber or gutta percha tube* (*d*) is then drawn over the glass bead chain, jointed, cemented and banded together, (*e*), so as to be both *air and water tight. In order that the submarine conductor of electricity may be applied to deep waters, I propose to attach around the conductor, at certain distances from each other, globular rings containing any required amount of air, so that the whole structure may be buoyed on the surface of the water or sunk to any desirable depth. Said globular rings are made of India rubber, covered with the gum percha, and fastened on the conductor with the same kind of gum.* The object of

this arrangement or combination is, to guard against and prevent the water from coming in direct contact with the telegraphic wire, thus securing the entire control of this mysterious agent. This combination secures the object so much desired. By insulating the wire with the gums, prevents the water from coming in direct contact with it; by covering the insulated wire with *the glass beads* closely jointed, confines the electricity to the wire; and if, by the operation of *the laws of nature,* chemical action produces moisture inside the *India rubber or gutta percha tube,* the space between the joints of the glass chain being comparatively nominal, the amount of water thus produced and occupying said space would amount to little more than moisture, and, even if this moisture were to come into direct contact with other conductors of electricity, it would require a vast amount of surface, thus exposed, to destroy the entire current; but, *the insoluble India rubber or gutta percha tube,* which encases the whole chain, being a *non-conductor,* throws up an interminable barrier between the great volume of water outside and the comparative moisture inside the tube, thus effectually confining and controlling the great current of electricity passing over the telegraphic wire. The joints in the glass chain and the elasticity of *the India rubber or gutta percha tube,* when complete (*d*), *are* sufficiently flexible to give any desired curve. What I claim as my invention and desire to secure by letters patent is, the combination and arrangement of *the gums* around the telegraphic wire, in such form as to secure the controlling power of the mysterious agent, electricity, as hereinbefore described."

A careful examination of the first specification leads to the conclusion, that in it Simpson uses the words "insoluble India rubber" to indicate one and the same article that he indicates by the word "gutta percha;" that he uses the two forms of expression as synonymous and as meaning the same thing; that he does not, by "insoluble India rubber," mean India rubber, as that substance was then recognized, made insoluble or in the condition of being insoluble, nor in any condition; but that the whole expression, "insoluble India rubber or gutta percha," means, "gutta percha, otherwise called by me insoluble India rubber." Thus, in the first specification, he calls the outside tube, in one place, "an insoluble India rubber or gutta percha tube," and in two other places an "insoluble India rubber tube," and in two other places an "India rubber tube." He speaks, also, of first insulating the wire with "insoluble India rubber or gutta percha," before covering it, thus insulated, with glass beads. Therefore, he clearly contemplated putting gutta percha next to the wire, in such manner as to insulate the wire, and he also contemplated making of gutta percha the outside tube which was to go over the glass beads. He

speaks of such tube, calling it an "insoluble India rubber tube," as "a powerful non-conductor." He, therefore, clearly means, that gutta percha is a non-conductor, for it is the tube which is to be a non-conductor, and he speaks of the tube as being made of gutta percha as well as the insulator next to the wire. It is in evidence that these specifications were both of them written by Simpson himself. He was not an educated man, accustomed to the use of precision in language. His spelling is defective and his modes of expression rude. The expression in the claim of the first specification, "the combination of the gums and glass around the telegraphic wire," is criticised, as showing that he meant, by "insoluble India rubber," one gum, and by "gutta percha" another and distinct gum. But the expression is satisfied by a more natural meaning. He says that he puts gutta percha next to the wire, then glass beads next outside, and then outside of the glass beads a gutta percha tube. Here are two coverings of gutta percha, two envelopes made of that gum, which two, when spoken of collectively, he designates as gums; and he speaks of the whole thing, in the claim, as "the combination and arrangement of the gums and glass around the telegraphic wire." There is glass between two layers of gum, and these two layers of gum he calls "gums." So, too, the expression, "insulating the wire with the gums," is criticised, as showing that he intended two gums. But he speaks of the wire as insulated by the gutta percha before the glass beads are put on; and, clearly, the insulation thus spoken of is by the one covering of gutta percha. There would be the use of but one gum to insulate, even if that gum were not gutta percha.

But much light is shed on the meaning of Simpson by the second specification, which he sent to the patent office as being more "explicit" than the first one, and as supplying the "former deficiency," and as "embracing the whole principle" of his plan for which he had asked a patent. In the second specification the word "gutta percha" is used in describing the outside tube, in every place where the tube is mentioned. In three places it is spoken of as an "insoluble India rubber or gutta percha tube," and in two places as an "India rubber or gutta percha tube." In two places where the words in the second specification are "insoluble India rubber or gutta percha tube," the corresponding words in the first specification are "insoluble India rubber tube," in two places where the words in the second specification are "India rubber or gutta percha tube," the corresponding words in the first specification are "India rubber tube," and in the fifth place the expression is the same in both specifications, namely, "insoluble India rubber or gutta percha tube." The insulation spoken of as taking place before the glass beads are put on is spoken of, in both specifications, as being made by "insoluble India rubber or gutta percha." The globular rings filled with air, to buoy the structure, a feature not in the first specification, are described in the second specification as "made of India rubber" and "covered with the gum percha," thus distinctly showing that Simpson did not, by "insoluble India rubber," mean "India rubber," and that he regarded gutta percha as a distinct article from India rubber. A further very marked change in the second specification from the first is, that the claim in the second is "the combination and arrangement of the gums around the metallic wire, in such form as to secure the controlling power of the mysterious agent 'electricity,' as hereinbefore described," instead of, as in the first, "the combination and arrangement of the gums and glass around the telegraphic wire, in such form as to secure the controlling power of the mysterious agent 'electricity,' as hereinbefore described." The second specification, like the first, speaks of gutta percha as a non-conductor of electricity, but it claims the combination and arrangement of the gums, (that is, the interior insulating layer of gutta percha and the exterior tube of gutta percha,) around the wire, as the controlling power which confines the current of electricity to the wire and prevents its passing off, and it leaves out any claim to the glass beads in connection with the gutta percha, whatever operation the glass beads may have, as non-conductors of electricity.

It is shown, by the testimony of Mr. Barr, one of the two persons who signed their names as witnesses to both of these two specifications, that he knew Simpson at Cincinnati in the years 1846 and 1847; that Simpson experimented first with India rubber, as an insulating covering for wire, and found that it was not a perfect insulator; and that he then experimented with and adopted gutta percha. There is, also, evidence that, as early as the 10th of January, 1848, Simpson was making enquiry as to gutta percha, and receiving information in regard to it from Horace H. Day, who was acquainted with it and with some of its properties. The earliest date at which any other person than Simpson is shown to have announced in the United States the insulating and nonconducting property of gutta percha, is the 10th day of February, 1848, on which day Mr. French, the president of the Magnetic Telegraph Company, which had a line of telegraph between New York and Washington, stated, in a letter written by him from Washington to Mr. Clark, the secretary of the company, at New York, that he had just made an insulator of gutta percha, in a mould made for a glass insulator, as an experiment, and that it was a non conductor. It also appears, that, on the same day, Horace H. Day, a dealer in gutta percha at that time, writes of it as a "new species of India rubber." In February or March, 1848, Simpson is found in Balti-

more, exhibiting to Professor Rogers, a gentleman extensively connected with telegraphy, a piece of wire covered with gutta percha, which he represented as intended to be used under water at draw-bridges in rivers, and it was then and there tested in water and found to be a good insulator. During the year 1848, Simpson is found in New York and in Baltimore endeavoring to attract attention to his invention. On the 6th of December, 1848, he made an agreement in writing with Horace H. Day, whereby he was enabled to prosecute the application for his patent. Up to that time he had not paid any fee at the patent office, or filed any model. The agreement in question states, that "Simpson did, in the winter of 1847 and '48, and as early as the month of November, '47, make invention of covering wires for telegraph purposes with gutta percha, and also with gutta percha and chain of glass, and with still an additional covering of rubber, and that he is desirous of taking out a patent for the same, or any portion of it which is patentable, and that he has not the means to take out a patent," and then Simpson "agrees to convey to Horace H. Day, and make over to him, one-half of all the right, title and interest which may result from the patent," "on condition of his paying the fees for patent office, and preparing model and papers," with this clause: "If no patent is granted, I promise to pay the twenty received back from the office to Day." In pursuance of this agreement, Simpson, on the 28th of December, 1848, made oath, at Baltimore, to a new specification, which, with a new petition for a patent, and a drawing and a model and $30 fee, were received at the patent office on the 2d of April, 1849. The office required other drawings and specimens, and suggested amendments to the specification, which were supplied on the 16th of June, 1849. The specification, as completed, states the invention to be "a new and improved mode of insulating electro-magnetic telegraph wire," and proceeds thus: "The nature of my invention is shielding the wire from contact with any or all conducting matter, by covering it with India rubber, glass beads and gutta percha, either together or separate. By this mode the covering, and also the wire, remain flexible, and can be conveniently and safely laid in the bed of rivers, or be buried in the earth, or be elevated on poles in the air, without liability to come in contact with water or other matter known as conductors of galvanic electricity. To enable others skilled in the arts to make and use my invention, I will describe it thus: The gutta percha must be softened by any of the well known processes, and, when in a malleable or plastic state, I spread it in any desired thickness around the wire. This operation, when well and carefully done, is sufficient of itself, without another coating, to insulate the wire, and, for all ordinary practical purposes,

may be used without any other preparation. For further security and to guard against rough usage, I also cover the wire with a coating of India rubber in a plastic state, or with the well known metallic rubber in a plastic state, and, when the rubber is dry, the whole is to be covered with a series of glass beads, of convenient length and thickness. Each bead is perforated, so as to fit closely to the rubber, and fitted close to each other by a socket or knuckle joint, produced by having one end of the bead convex, while the opposite end is concave, and so placed over the rubber that the convex end of one bead shall fit into the concave end of the next adjoining bead. Over the beads I place a coat of gutta percha in a plastic state, and the whole thus forms a flexible shield, that renders the wire secure against all external influence from water or other conductors of electricity. What I claim as my invention and desire to secure by letters patent is, the application of gutta percha as a covering or shield for wire, to insulate it for electro-magnetic telegraphs, and also the application of India rubber, glass beads and gutta percha together, in the manner and for the purpose hereinbefore described. I do not claim the application of glass alone as a covering to insulate electro-magnetic wires, that having been in use before my discovery." On the 7th of September, 1849, the patent office rejected Simpson's application, by the following letter to him: "Upon examination of your application for letters patent for a mode of insulating telegraph wires, it is found that the invention is not new. You are referred to Messrs. Amos Kendall, Alfred Vail, Samuel F. B. Morse and others connected with the electro-magnetic telegraph, for information upon this subject. This method of insulating was claimed by some one of the above persons, and known at this office several years since. Irrespective of this fact, it is doubtful if the use of glass in this way could be considered a new and patentable invention or discovery." Simpson replied to this letter on the 15th of September, but his reply is missing. On the 19th of September the patent office wrote to him thus: "In reply to yours of the 15th inst., I have to state that it is not remembered exactly when wire covered with gutta percha was deposited in this office. It was left here by Alfred Vail, then of Washington, to whom you are referred for information. You may be able to reach him through Prof. Morse, of New York, or Hon. Amos Kendall, of Washington. The office does not consider that the form of your glass insulators presents any patentable novelty." Simpson replied to this letter on the 20th of September, but his reply is not produced. On the 25th of September, the patent office addressed him thus: "In reply to yours of the 20th inst., I will state that it is not known when Mr. Vail exhibited his specimen of wire covered with guttta percha to this of-

fice. He filed no papers at the time, but merely showed the article as a specimen of workmanship. There have been two applications for letters patent prior to yours, for covering wire with gutta percha, rejected upon the ground that the insulating property of gutta percha being known, its use to protect wires, &c., was not a patentable invention, in view of the fact that various other insulating materials had been employed for the same purpose." On the 27th of September, Simpson wrote to the patent office as follows: "Your letter of the 25th inst. came to hand last evening. As my discovery dates back to the 23d of November, 1847, I desire to ascertain positively whether the two applications referred to in your letter were filed prior to that date; also, if Mr. Vail's specimen was exhibited before or after that date; also, when and where the first application of gutta percha to telegraph wires as an insulator was made and exhibited." To this letter the patent office replied, on the 29th of September, as follows: "In reply to your letter of the 27th inst., I have to state that the application of James Reynolds, of New York, for covering wires with gutta percha, was filed in this office June 9th, 1848, and that, at present, no earlier definite information can be given upon this subject. The pressure of business upon this office is such that the investigation you desire cannot consistently be made." To this letter Simpson replied September 30th, but his reply is not furnished. On the 3d of October, the patent office wrote to him as follows: "I have to acknowledge the receipt of your letter of the 30th ult. Your application has received all the attention to which it is entitled, and you have the alternative of withdrawal or appeal from the decision of this office. In reference to the use of glass beads for insulation of telegraphic wires, I will remark that it has been found, since the last communication addressed to you, that the same invention was claimed under an application filed in this office by Alex Jones, of New York, on the 20th of February, 1847."

The specification of the application so rejected, made prominent and claimed "the application of gutta percha as a covering or shield for wire, to insulate it for electro-magnetic telegraphs," and stated that the wire would be sufficiently insulated if well and carefully covered around with gutta percha put on in a plastic state, and that the object was to shield the wire from contact with conducting matter. This is the same invention described in his first specification. The two prior applications for covering wire with gutta percha, referred to in the patent office letter of September 25th, were that of John J. Craven, filed May 12th, 1848, and that of James Reynolds, filed June 9th, 1848. There is no evidence that any one of the persons named in the patent office letter of September 7th had any knowledge of the insulating properties of gutta percha at an earlier date than January 31st, 1848, otherwise than as such knowledge may have come to them from Simpson, nor is there any evidence that a specimen of wire covered with gutta percha was deposited in, or exhibited to, the patent office, by Mr. Vail, or any other person, before January 31st, 1848. Simpson gave to the office the date of November 23d, 1847, as the date of his invention of applying gutta percha to a telegraph wire as an insulator. His application was rejected on the ground that he was not the first to make such invention. Yet he was told by the patent office that the pressure of business in it was so great that it could not investigate and inform him whether the things it referred to as anticipating him, were in fact before the date he gave, or when the invention, if made before he made it, was made, and that his application had received all the attention to which it was entitled, and that he could either withdraw it or appeal from the decision of the office. He conducted his application himself and not through an agent. During the year 1850, Simpson corresponded with two different patent solicitors in regard to his application, and evinced, by his letters, an intention to prosecute his application. On the 13th of January, 1851, he wrote to the patent office thus: "Please pay to the order of George B. Simpson, claimant for insulation of telegraph wire, twenty dollars balance of patent fee to be refunded on rejection of claim." The $20 was refunded by the patent office on the 21st of January, 1851. The application for the patent was not otherwise withdrawn. He did not make any further communication to the patent office until November, 1858, nor did he renew his application for a patent until the 24th of December, 1858. In May, 1851, he went to Missouri, and remained there until the spring of 1852. He then went over the plains to Oregon or California, or both, and went back and forth, engaged in various employments, poor and unsuccessful, until 1857. In the fall of 1853, he seems to have visited Washington, and to have had an interview with the commissioner of patents as to his rejected application, and, in January, 1854, he wrote a letter to Mr. Veitch, a gentleman largely interested in telegraphy, in which he says: "Telegraphing has interested me since the idea first burst upon the public mind, and, as regards insulation of the wire, I still claim precedence, having first used glass, India rubber and gutta percha as early as the fall of 1847. * * * The right to use the gutta percha belongs to me." On the 22d of December, 1858, he swore to the specification for a new application. The language of this specification and its claim was, with slightly verbal differences of no importance, like that of the specification and claim of the patent finally issued. This specification, with the new application, was filed in the patent office on the 24th of December, 1858, and, on the

same day, a new fee of $30 was paid. On the 29th of December, 1858, his application was rejected in a letter in which the patent office said: "Insulating electrodes in gutta percha is, you are aware, well known. The degree of elasticity is wholly optional, regard alone being had to practical results, to the particular end in each case to be obtained. The journals of France, England and this country, for several years back, fully treat the subject. Your claim is refused." On the 14th of January, 1859, Simpson wrote to the patent office as follows: "In reply to your note rejecting my application for letters patent for a 'submarine telegraph cable,' I have to ask a reconsideration of the case, inasmuch as the scientific journals of England, France and this country make no mention of the insulation of electrodes in gutta percha prior to the 1st of August, 1848, and that I have abundant proof of my discovery and insulation of the same as early as the 22d of November, 1847." This letter was accompanied by an affidavit sworn to by Simpson, on the 14th of January, 1859, to the effect that he believed himself to be "the original and first inventor of the insulation of the telegraph wire with gutta percha, or submarine telegraph cable, as set forth in his specification and drawings of the 24th of January, 1848, and of the 22d of December, 1858." On the 14th of January, 1859, the patent office, after receiving said letter and affidavit, informed Simpson, by letter, that his "alleged invention" had been "abandoned to the public." Thereupon Simpson submitted to the patent office a statement in writing, which he called "a history of the case," and also called attention to his former specifications and models and to various letters and affidavits which accompanied such statement. In this "history of the case," which was sent by him to the patent office on the 19th of January, 1859, he gives the 22d of November, 1847, as the date of the conception of his invention, and alleges that, in November and December, he made a model of metallic wire covered or insulated with cotton thread, wooden beads and India rubber hose, and drew his first specification. He recites the making of his first application, the making and filing of his second specification, the filing of his application of April 2d, 1849, its rejection and the withdrawal of the fee. He says: "On the 21st day of January, 1851, I withdrew the patent fee, all the models, drawings and papers connected with it remaining in the office. Thus the case remained till 1858." He also states, that, on the 12th of November, 1858, he withdrew his original specification from the patent office, for the purpose of renewing his application; that he was informed by the office that no drawings of his could be found earlier than those belonging to his application of April 2d, 1849, and that his original models could not be found in the office; and that the necessity of procuring evidence as

to such drawings and models delayed for a time the making of his application of December 24th, 1858. He then recites the filing of that application, its rejection on the 29th of December, 1858, the contents of his letter to the patent office of January 14th, 1859, and the fact of the rejection of his application on that day, on the ground that his invention had been abandoned to the public. He states, that, on the 24th of November, 1849, he paid to Mr. Day the $20 which was to be refunded by the patent office. In reply to the allegation of abandonment, he adduces, as evidence that he did not abandon his invention, the fact that he wrote a letter to Mr. Day on the 24th of November, 1849, stating that his "decision" in that instance did not necessarily imply a total surrender of his claim, and asserting that his claim was valid. Day had written to him, on the 19th of November, 1849, regretting his "decision" in regard to his application for a patent, and he, in reply, tells Day that he had duly considered Day's letter, and that it offered nothing which would induce him to change his "decision." This "decision," even if it was a decision not to then take any further steps in regard to his application, by pressing it on the patent office, or appealing, or availing himself of other means of redress, was accompanied by the declaration that he did not abandon his invention or his claim. He further states that he was not able to defray the expense incident to a successful prosecution of his claim; that his correspondence with the patent office from November 23d, 1847, to the withdrawal of the patent fee in 1851, shows that his application of 1858 is not affected by the objections or decisions of the office; and that, if it should still be argued that his claim was abandoned to the public by the withdrawal of the patent fee, and that the public were not properly notified by him not to appropriate his invention to its use, he suggests that the newspaper publications in 1848 were a legal bar to such action on the part of the public, inasmuch as those publications asserted his claim and that he had taken the proper steps to secure a patent, and that the public had never since been notified to the contrary. Such were the contents of his "history of the case." As a consequence of Mr. Simpson's appeal or representations his application was examined by three officials in the patent office, who, on the 22d of January, 1859, made a report in writing upon it to the commissioner of patents. That report states, that Simpson first duly applied for a patent for insulating telegraph wires, by coating them with gutta percha, on the 2d of April, 1849; that the application was rejected on the 7th of September, 1849; that he took no appeal from the decision, as provided by law; that, on the 21st of January, 1851, the application was duly withdrawn; that, from that date, he took no steps to secure a patent, until

November 15th, 1858, when he wrote a letter to the patent office on the subject; that he afterwards filed his application of December 24th, 1858; that it was rejected on the 29th of December, 1858, for the reasons then assigned; and that it was again rejected by the letter of the office of January 14th, 1859. The report then says: "The ground of objection to the application now in question is, that the alleged invention had been in public and common use for more than two years (in fact for many years) prior to his present application; that, for years past, and before this application was made, the public journals in France, England and the United States have contained a record of the employment of gutta percha for insulating telegraphic wires; that such wires are now and have been, so insulated, notoriously in use in the United States, which use must, by reason of such notoriety, have come to the knowledge of the applicant; and that the fact that he has suffered for more than seven years, (from January 21st, 1851, to November 15th, 1858,) said invention so to be used without taking any steps to prosecute his claim to a patent, in law constitutes such use as having been made with his consent and allowance, thus, by his own act, working an abandonment of his invention to the public. The authorities in support of such ground of objection are abundant and need not here be cited. We think the application should be finally rejected, and so recommend." On the 2d of February, 1859, this report was confirmed by the commissioner of patents and the application was rejected, and on the next day Simpson was informed of the decision. On the 8th of October, 1859, he made another application to the patent office for a patent, on a specification like the one of December, 1858, and paid a new fee of $30. In a paper filed by him in the office on the 11th of October, 1859, and called "Reasons Why a Patent should Issue to Me," he states, that the fact that the decisions of the office in his case, in 1849, were made, entitle him to the benefit of the law as it would have been if the office had then granted his patent. On the 24th of October, 1859, the office advised him, that there did ont appear to be sufficient reason for reversing the decision of the office of January 14th, 1859; that the papers furnished by him did not "justify non-abandonment;" and that his claim was refused. On the next day he wrote to the office, acknowledging the receipt of its letter of the day before, and said: "Before appealing from your decision, I would inquire on what proof of abandonment to the public does the office base its decision." On the 4th of November, 1859, the office, in reply, referred him to the law and practice of the office, that, when an alleged invention had been completed, "and been in public use for more than two years, with the knowledge and consent, (i. e. not protesting,) the invention cannot be patent-ed." It added: "Your mode of insulating electrodes with gutta percha has been in public use many years, and is, therefore, within the scope and meaning of the law referred to." On the 26th of November, 1859, the office, in a letter to Simpson, said: "There do not appear to have been just grounds for the rejection of your application, as per official letter of 1849, and, therefore, the patent was, as far as known to this office, rejected upon insufficient grounds, and, had the matter been pressed to the final decision then, it would have been granted, it is believed. But this office is bound to refuse it now, by virtue of a statute expressly prohibiting a grant, provided the invention has been more than two years in public use with the knowledge and consent of the inventor, which, in your case, is not denied. Your remedy, at the time of rejection, lay in an appeal, which was not taken. This would have set aside the decision of the commissioner, or, even if not, then, having exhausted the means given you by the law to obtain justice, it would have thrown the fault on this office, and it would be bound to correct its own error. There seems but one course left, and, unless a special act removes the aforesaid disability, the case must stand rejected." On the 4th of April, 1860, Simpson addressed a letter to the office, insisting that he had not abandoned his invention before he applied for a patent, that the mere withdrawal of the fee was not an abandonment, and that, as the office had acknowledged that the application was rejected in 1849 on insufficient grounds, it ought to correct its own error. Subsequently, a board of three persons in the patent office examined the application, and reported on it as follows: "The present application was filed October 8th, 1859, and, in our opinion, a patent should be refused upon it, for the reasons stated by us in regard to the application of 1858. On the ground, then, that this applicant has abandoned his invention to the public, we recommend that a patent on his application be refused." On the 9th of May, 1860, the commissioner confirmed that report and refused the patent, and Simpson was notified of such decision on the 15th of May, 1860. At that time, under the provisions of the seventh section of the act of July 4, 1836 (5 Stat. 119), as modified by the eleventh section of the act of March 3, 1839, (5 Stat. 354), and as further modified by the first section of the act of August 30, 1852 (10 Stat. 75), Simpson had a right to appeal from the decision of the commissioner rejecting his application, to one of the judges of the circuit court of the United States for the District of Columbia. He appears to have taken such an appeal to Judge Dunlop, of that court, for, the papers on his final application show, that, on the 9th of April, 1861, Judge Dunlop affirmed the commissioner's decision of May 9th, 1860, and overruled all the reasons of appeal. [Ex parte Simpson, Case No. 12,878.] During

the years 1861, 1862, 1863, 1864 and 1865, Simpson was persistent in urging his application upon the attention of the then commissioner of patents, both personally and by letter. He also applied to congress for relief. On the 11th of February, 1862, he presented to the house of representatives a petition for a patent for his invention. On the 7th of March, 1862, the committee on patents reported a bill authorizing the commissioner of patents to rehear his application and to grant it, as if it had never been heard or decided. The bill was passed by the house on the 2d of May, 1862. On the 5th of May it was sent to the senate and referred to the committee on patents. On the 10th of July, it was reported from that committee. On the 15th and 17th of July, 1862, it was considered by the senate, but was not passed. On the 4th of May, 1866, Simpson filed the application on which the patent was granted. He swore to the specification on that day. On the 15th of August, 1866, the application was rejected, in a letter from the office, which stated, that, as the ground theretofore taken by the office, of abandonment, had been sustained by the decision of the court, it was not competent for the office to go behind that decision, which must be regarded as final, so far as the office was concerned, so long as it remained unreversed by a higher tribunal. In reply, Simpson, on the 17th of August, wrote to the office, claiming that the office could revise the entire case and grant a patent, if it should find that the prosecution of the application had been continuous; that the withdrawal of the fee was not an abandonment of the claim; and that there was no proof of abandonment. On the 25th of August, the office replied, that it had no power to review the decision of Judge Dunlop; that, by the eleventh section of the act of March 3, 1839, it was provided, that his decision should govern the further proceedings of the commissioner in the case; that his decision was, that the rights of Simpson were forfeited by abandonment of the invention; and that, while such decision stood unreversed, it must govern, and the office must decline the further consideration of his claim. The application was then considered by the examiners in chief, on appeal, and they, on the 9th of April, 1867, affirmed the former action of the office, and decided that the application should be refused. The application was then examined by Mr. Hedrick, an examiner in the patent office, who, on the 7th of May, 1867, made the following report to the commissioner of patents: "I have examined the arguments and papers in the application of George B. Simpson, for improved insulator for submarine and other telegraphic lines. I have especially examined the question of novelty at the time of the first application to the office, and find that the invention was then new, and was sufficiently important to entitle the applicant to a patent. I have also examined the papers submitted by the inventor to show that he never abandoned his claim, and only withdrew his application under protest, and that, therefore, nothing more than constructive abandonment can be made out against him. The whole case is a very extraordinary one. There seems to be no doubt, that the invention was one that deserved a patent, and that the inventor did what should have entitled him to a patent, and the office has, at various times, held that opinion, but has always, either from mistake as to the character of the invention, as in the first instance, or from the idea that there was a constructive abandonment, refused it to him, whilst the inventor has at all times, and against all adverse opinions from official and unofficial quarters, asserted that he was entitled to and should receive a patent for his invention. This has been continued for near twenty years, until the invention is in general use and the public acting in the belief that the invention is public property." The patent was, on the 10th of May, ordered to issue, and was issued on the 21st of May, 1867. Simpson had become a paymaster in the United States army, and, while such, died at New Orleans, of yellow fever, on the 5th of October, 1867.

The principal defence pressed on the question of novelty, is the alleged prior invention of John J. Craven. I have carefully considered the evidence on this subject, and am of opinion that it does not show that Craven's invention was made earlier than at a date subsequent to the filing in the patent office by Simpson of a description of his invention. The publication in Dingler's Polytechnic Journal of 1848 gives an account merely of experiments then in progress and not of a completed invention, even if the part of it in question was published prior to Simpson's invention, and it does not set forth the insulating or non-conducting property of gutta percha, for use with a telegraphic wire under water. The patents of Cook and Brooman do not, either separately or together, show Simpson's invention. The patent of Wharton shows only the use of gutta percha as a substitute for leather, and makes no mention of its insulating or non-conducting property in reference to electricity. Nothing is adduced which anticipates Simpson's invention in point of time, as that invention has hereinbefore been construed.

The bill sets forth, that the improvement invented by Simpson "was not at the time of his application for a patent therefor in public use or on sale, with his consent and allowance." It also states, that Simpson, being the inventor, made application for a patent for his invention, and that such proceedings were thereon had, that the patent was issued. The bill does not set forth any date as the date of the application to which it refers. The answer denies that the improvement of Simpson "was not, at the time of his application for a patent therefor, in pub-

lic use or on sale with his consent or allowance." It also alleges, that the patented improvement has been, for more than two years before Simpson's application for a patent therefor, in public and common use in the United States, without any notice on the part of Simpson that he claimed to be the first and original inventor thereof, and without any objection on his part, but, on the contrary, with his knowledge of and acquiescence in such common use, and with his consent and allowance; and that, if he was the first inventor of such improvement, or ever had any right to a patent for it, he wilfully and without excuse and for many years delayed and forbore to apply for a patent for it, and abandoned it and his right to have a patent for it, and dedicated it to the public, and, meantime, it became known to the public and the defendant from other sources. The answer states no date as the date of the application. Its language, properly construed, sets up a loss of the right to a patent by acquiescence in use, laches, abandonment or dedication, before the application for a patent and not afterwards.

The patent in this case, being issued before the patent act of 1870 was passed, is to be adjudicated under the act of 1836, before cited, and the acts amending the same. The seventh section of the act of 1836 (5 Stat. 119) provides, that, if the commissioner of patents shall decide that the invention covered by an application for a patent is not new, he shall notify the applicant thereof, giving him such references as may be useful "in judging of the propriety of renewing his application," or of altering his specification, so as to embrace only what is new. The statute then proceeds: "In every such case, if the applicant shall elect to withdraw, his application, relinquishing his claim to the model, he shall be entitled to receive back twenty dollars, part of the duty required by this act, on filing a notice in writing of such election in the patent office, a copy of which, certified by the commissioner, shall be a sufficient warrant to the treasurer for paying back to the said applicant the said sum of twenty dollars. But, if the applicant in such case shall persist in his claim for a patent, without any alteration of his specification, he shall be required to make oath or affirmation anew, in manner as aforesaid." The statute then provides, that if the specification and claim shall not have been so modified as, in the opinion of the commissioner, shall entitle the applicant to a patent, he may, on appeal, and on request in writing, have the decision of a board of three examiners, as to the propriety of the commissioner's decision, the board or a majority of them having power to reverse such decision, either in whole or in part, and it being declared that the commissioner shall be governed by the opinion of the board in the further proceedings to be had on the application. By the eleventh section of the act

of March 3, 1839 (5 Stat. 354), the chief justice of the District of Columbia was designated as the officer to hear such appeals, instead of the board of examiners. By the first section of the act of August 30, 1852 (10 Stat. 75), it was provided that such appeals might also be made to either of the assistant judges of the circuit court of the District of Columbia.

The papers filed by Simpson in the patent office, January 31st, 1848, embraced a petition for a patent, a specification, an oath thereto, and a drawing. There was no model filed, or fee paid. Those papers remained in the patent office, continuously, until the 12th of November, 1858, when Simpson procured them from the office for the purpose of making his renewed application of December 24th, 1858. An applicant always had the privilege of amending his specification. Under that privilege, Simpson filed his amended specification of February 21st, 1848. His application of April 2d, 1849, consisted of a petition, specification, oath thereto, drawing, model, and a fee of $30, and was made complete on the 16th of June, 1849. The specification on that application was entirely sufficient in its description of the mode of preparing the gutta percha to cover the wire, and of the mode of insulating the wire with the covering of gutta percha, whatever may be said of the sufficiency, without amendment, of the prior two specifications. The specification of 1849 is not as detailed as those which followed it, but is substantially the same, as regards the preparation of the gutta percha, and the coating of the wire with it. There is no ground for any allegation, that Simpson's invention was in public use for more than two years before April, 1849, or even June, 1849, or that he abandoned or dedicated it to the public before either of those dates. His specification of 1849 is fairly to be considered, for the purposes of this suit, as an amendment of his two specifications of 1848, and the application of January, 1848, is to be regarded as an application completed in 1849, in such wise that the application made in January, 1848, is to be regarded as a continuous application, rejected in October, 1849. By the statute, as it stood at the latter date, the applicant, on the rejection of his application for want of novelty, which was the ground of such rejection of Simpson's application, had placed before him two alternatives. One was to elect to withdraw his application, whereupon, on filing a notice, in writing, of such election, he would be entitled to receive back $20. The other was to persist in his claim for a patent, whereupon, on filing a new oath, he could take an appeal. If he did not file a notice of his election to withdraw his application, he was to be regarded as persisting in his claim for a patent. In the present case, Simpson did not file any notice of his election to withdraw his application, or any notice that he with-

drew his application. He asked for the $20, without withdrawing his application, and, although the office was not authorized to pay him back the $20 unless he withdrew his application, it did so. The office may have regarded the request for the $20 as equivalent to a withdrawal of the application, but the statute is distinct, and a request to be paid "twenty dollars balance of patent fee, to be refunded on rejection of claim," cannot be construed as a withdrawal of the application, even though the $20 was refunded and accepted. The statute is plain, and the applicant may have intentionally refrained from withdrawing his application, while, if the office had informed him ·that the $20 would not be refunded unless he first filed a withdrawal of his application, he might have refused to file such withdrawal, lest it might prejudice his rights. He left all the papers in the patent office. According to his own statement, he had refunded to Day the $20 fourteen months before he received it back from the patent office. Therefore, when he asked the office for the $20, it must have been ·solely because of his need of money. There is no act or declaration of his, in connection with the refunding of the $20, that can be construed into an abandonment of his application, or of his invention.

Nor is there any evidence of any affirmative abandonment of his invention, between October, 1849, and December, 1858. There is nothing but the lapse of time. As to that, the evidence shows that he was poor, during all that time. He might have taken an appeal from the decision of October, 1849, but the treatment he had received from the patent office, afterwards acknowledged by it to have been wrong and unjust, and the array of distinguished names in telegraphy, presented by the office to discourage him, with statements showing how greatly the office relied on information received from them, might well have deterred him from entering, at the time, on a further contest. The evidence shows, that, from 1849 to 1858, he was always poor; that he went to the Pacific coast to better his pecuniary condition; and that he worked his way out there. Under all the circumstances, his application of 1858 must be considered, not as a new application, but as a continuation of his prior applications; and so must his applications of 1859 and 1866. From 1858 to 1866, the efforts of Simpson to procure the allowance of his claim to a patent were continuous and persistent, and no laches can be imputed to him, nor is any ground shown for holding that he abandoned his invention after 1858.

In Adams v. Jones [Case No. 57], Mr. Justice Grier says, that. by the application filed in the patent office, the inventor makes a full disclosure of his invention, and gives public notice of his claim for a patent; and that the delay afterward interposed by the mistakes or obtuseness of public officers, where gross laches cannot be imputed to the applicant, cannot affect his right. In that case, an application was made in 1850, and was never withdrawn, and the patent was granted in 1857, and was sustained.

The case of Dental Vulcanite Co. v. Weatherbee [Case No. 3,810] was decided by Mr. Justice Clifford, on the Cummings patent of 1864, reissued twice in 1865. The first application was made in 1855, and it was, after three examinations, finally rejected on appeal, by the commissioner of patents, in 1856. It was not further appealed, and was not renewed till 1864, when a new application was filed, on which the patent was issued. In the interval between the filing of the original application and that of 1864, the invention had gone into use to a considerable extent, with the knowledge and consent of the applicant. There was no withdrawal of the application, and no evidence of an intent to abandon the invention, except inference from the above facts. It was urged in opposition to the validity of the patent, that Cummings had abandoned his invention, because, after the rejection of his application in 1856, he did not appeal or apply anew until 1864. In deciding on this point, Mr. Justice Clifford says: "Strong doubts are entertained whether any new application was necessary; but, if it was, it is believed to be well settled, that the second application must be regarded as having been filed in aid of the first, on which the rejection took place. Godfrey v. Eames, 1 Wall. [68 U. S.] 317. Actual abandonment is not satisfactorily proved." The patent was sustained. The same judge made a like ruling on the same patent, in Goodyear Dental Vulcanite Co. v. Gardiner [Case No. 5,591], and so did Judge Shepley, in Goodyear Dental Vulcanite Co. v. Smith [Id. 5,598], and Mr. Justice Hunt, in Goodyear Dental Vulcanite Co. v. Root [Id. 5,597], and Judge Emmons, in Goodyear Dental Vulcanite Co. v. Willis [Id. 5,603]. The supreme court of the United States, in Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, sustained the Cummings patent against the same objection, holding that the application of 1864 was to be regarded as a continuation of the application of 1855. The case of Cummings was, in all substantial features, like the present case. He did not withdraw any part of the fee originally paid, but it has been shown, that withdrawing part of the fee, in the case of Simpson, is not to be regarded as a withdrawal of the application. The whole matter is summed up by Mr. Justice Strong, in delivering the opinion of the court, in the case last cited, in these words: "We are not aware that filing a second petition for a patent, after the first has been rejected, has ever been regarded as severing the second application from the first, and depriving the applicant of any advantage he would have enjoyed had the patent been granted without a renewal of the application. The contrary was decided by the circuit court for the southern district of Ohio, in Bell v. Daniels

[Case No. 1,247], and in Blandy v. Griffith [Id. 1,529]; and these decisions are founded in justice and sound reason." It was proved, in the Cummings Case, that, between the rejection of 1856 and the application of 1864, his invention had come into general public use. In the present case, there is no proof that any use in public of Simpson's invention was at any time made with his consent, allowance, or acquiescence.

In the case of Johnsen v. Fassman [Case No. 7,365], an application made in 1856 was rejected in 1857, for want of novelty. The applicant took no further steps till 1866, when he took an appeal, which resulted in the granting of a patent. Meantime, patents for substantially the same invention were issued to other inventors. During four of the nine years the applicant was a citizen of a state in rebellion. There was no withdrawal of his application. It was held that no direct or implied abandonment was shown.

In McMillin v. Barclay [Case No. 8,902], an application was made in 1855, and was finally rejected in 1856, on appeal to the commissioner of patents. It was not withdrawn, but nothing more was done in regard to it until 1867, when the specification was amended, and, on further consideration, a patent was granted. Judge McKennan held that there was no abandonment, express or implied, and that the lapse of time was satisfactorily explained.

In Bevin v. East Hampton Bell Co. [Case No. 1,379], an application was made in 1852 and rejected two months afterwards. The next month the applicant took from the patent office his application and all the papers connected with it, except one drawing, but made no formal withdrawal. He never returned those papers. For ten years he did nothing more. During that time the invention went into open and notorious use, in his own neighborhood and under his own eyes, and so continued for ten years, without remonstrance from him. He was not poor, and was engaged in a successful business. In 1862, he made a new application, and a patent was granted in 1869. It was held that he had abandoned his application of 1852. Great stress was laid by the court on the fact of the taking of all the papers from the patent office, and withholding them, and on the fact of such use of the invention, and on the fact of the absence of poverty. The present case differs from the Bevin Case in the particulars just referred to.

The case of Marsh v. Sayles [Case No. 9,119] holds, that, where an application was rejected, and twenty dollars of the fee was refunded, and then there was a delay of eighteen years before the application was renewed, and no attempt is made to explain the delay, it will be held that there was an abandonment of the invention to the public. That is not the present case.

In Consolidated Fruit Jar Co. v. Wright,

94 U. S. 92, the invention was completed in 1859, and no application was made for a patent till 1868. It was held that the facts showed abandonment before the application. No sufficient reason for the delay was given. There was no proof of want of pecuniary means, and there was proof of use by the public for more than two years before the application. The case is unlike that of Simpson.

In United States Rifle Co. v. Whitney Arms Co. [Case No. 16,793], the answer is set up, as a defence, that the patent was applied for in 1868, and that the invention had for more than two years before that date been in public use and on sale with the consent and allowance of the inventor, Cochran, and that, prior to that date, it had been abandoned to the public. Cochran applied for a patent for the invention, an improvement in breech-loading guns, in 1859. It was rejected within a month. He took no appeal from the rejection by the primary examiner, and, one year and twelve days after the rejection, he withdrew the application and received a refund of $20. In 1868, he filed a new application, which was rejected on the ground of abandonment. The commissioner affirmed such decision, but it was reversed by the supreme court of the District of Columbia. The commissioner then declined to issue the patent, but, after the passage of the patent act of 1870 [16 Stat. 198], a new application was filed, and a patent was issued. During the eight years from 1860 to 1868, Cochran obtained 22 different patents, on his own application, 9 of which related to breech-loading fire-arms. He prosecuted his other inventions with constancy and energy. The court held, that no poverty was shown as a reason for not renewing and pressing his application; and that, if it were, it would tend greatly to dispel the idea of laches. Stress was laid in that case, by the court, on the withdrawal of the application, and the patent was held to be invalid. The decision in that case is not of weight in reference to the facts of Simpson's case.

On all the points in issue, it must be held, that the plaintiff has established his case, and there must be the usual decree for the plaintiff, for an injunction and an account, with costs.

[NOTE. For other cases involving this patent, see Colgate v. Gold & Stock Tel. Co., Case No. 2,991; Colgate v. Law Tel. Co., Id. 2,993a; Colgate v. International Ocean Tel. Co., Id. 2,993; Colgate v. Compagnie Française du Telegraphe de Paris, 23 Fed. 82; Colgate v. Gold & Stock Tel. Co., Case No. 2,992; Colgate v. Western Union Tel. Co., 19 Fed. 828; Colgate v. Western Union Tel. Co., Case No. 2,994.

[For a subsequent opinion on motion for an attachment for violation of the injunction herein, granting complainant's motion, see Case No. 2,994, next preceding.

[In January, 1879, complainant applied for a final injunction, which was granted as to any further use of the invention, but, as to certain uses to which it had already been applied, the question of perpetual injunction was postponed

to await an accounting and application for a final decree. Subsequently the parties entered into negotiations which resulted in defendant's taking a license, and paying $100,000 for a release. Thereafter defendant applied for a rehearing of the cause on the ground of newly-discovered evidence of the withdrawal of the application for the patent, and the application was denied. Colgate v. Western Union Tel. Co., 19 Fed. 828.]